Slip Op. 13- 110

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MICHAELS STORES, INC., | |
| Plaintiff, | |
| v. | Before: Jane A. Restani, Judge |
| UNITED STATES, | Court No. 12-00146 |
| Defendant. | Public Version |

**OPINION**

[Plaintiff's motion for summary judgment in antidumping duty matter is denied, and summary judgment is entered in favor of defendant.]

Dated: August 21, 2013

Lewis E. Leibowitz, Craig A. Lewis, Eric B. Gillman, and Wesley V. Carrington Hogan Lovells US LLP, of Washington, DC, for plaintiff.

Carrie A. Dunsmore, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Daniel J. Calhoun, Attorney, United States Department of Commerce.

Restani, Judge: This matter is before the court following denial of Defendant United States' motion to dismiss in Michaels Stores, Inc. v. United States, Slip Op. 12-161, 2012 Ct. Int'l Trade LEXIS 161 (Dec. 27, 2012). Plaintiff Michaels Stores, Inc. ("Michaels") challenges the liquidation and cash deposit instructions issued by the Department of Commerce ("Commerce") in administering the antidumping duty ("AD") order for certain cased pencils from the People's Republic of China ("PRC"). See Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China, 59 Fed. Reg. 66,909, 66,909 (Dep't Commerce

Dec. 28, 1994) ("Cased Pencils Initial Order"). For the reasons below, the court determines that Commerce lawfully issued liquidation instructions covering the 2008–2009 and 2009–2010 administrative review periods for certain cased pencils that were imported by Michaels.

## BACKGROUND

At issue in this case is the content of liquidation instructions issued following administrative reviews covering two periods of review ("POR"), the 2008–2009 POR and the 2009–2010 POR, both arising out of the 1994 AD order on cased pencils. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, Request for Revocation in Part, and Deferral of Initiation of Administrative Review, 75 Fed. Reg. 4770, 4771 (Dep't Commerce Jan. 29, 2010) ("Initiation of Administrative Review 2010"); Initiation of Antidumping and Countervailing Duty Administrative Reviews, 76 Fed. Reg. 5137 (Dep't Commerce Jan. 28, 2011) ("Initiation of Administrative Review 2011"). The parties appear to agree on the facts presented below.

During the 2008–2009 POR, Michaels purchased goods that had been produced by three manufacturers of cased pencils, China First Pencil Co., Ltd. ("China First"), Shanghai Three Star Stationery Industry Co., Ltd. ("Three Star"), and Shandong Rongxin Import and Export Co., Ltd. ("Rongxin"). Mem. of Points & Authorities in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") at 2; Def.'s Resp. to Pl.'s Mot. for Summ. J. ("Def.'s Resp.") at 6. Michaels received these pencils from three different PRC exporters. Pl.'s Mem. at 2; Def.'s Resp. at 6. Similarly, during the 2009–2010 POR, Michaels purchased goods that had been produced by two manufacturers, China First and Rongxin. Pl.'s Mem. at 6; Def.'s Resp. at 12. Again, Michaels did not receive the pencils directly from these producers, but instead it received them from two

different PRC exporters.[1]  Pl.'s Mem. at 6; Def.'s Resp. at 12.

      The cash deposit instructions issued by Commerce, to which the liquidation instructions referred, informed U.S. Customs and Border Protection ("Customs") that "if any entries of this merchandise are exported by a firm other than the <u>exporters</u> listed above, then the following instructions apply."  Pl.'s Mem. Ex. 6 at 1–2, Ex. 9 at 2, Ex. 11 at 1–2 (emphasis added).  Commerce first ordered Customs to use a separate rate "[i]f the PRC or non-PRC <u>exporter</u> of the subject merchandise has its own rate."[2]  <u>Id.</u> (emphasis added).  Because the exporters of the subject merchandise were not given separate rates in the instructions, Customs continued to the second paragraph, which required Customs to apply the PRC-wide rate to subject merchandise "[f]or all PRC exporters of subject merchandise which have not been assigned to a separate rate."[3]  <u>Id.</u>  As a result, although the cash deposit instructions included separate rates for the companies that produced the merchandise in question, those rates applied

---

[1] Collectively, the exporters from which Michaels received the merchandise in question will be referred to as the "subject" exporters.  Michaels refers to these exporters that were not individually reviewed as the "unreviewed" exporters, but this term is a misnomer, as the court concludes that these exporters, in fact, were reviewed collectively as part of the PRC-wide entity.

[2] Commerce's separate rate procedure is not compelled by statute.  Instead, Commerce's procedure requires companies in nonmarket economies ("NME") to assert their independence to avoid being classified as part of the PRC-wide entity.  Mandatory respondents may apply for separate rate status through an antidumping questionnaire response, and nonmandatory respondents may apply through a separate rate application.  See <u>Yangzhou Bestpak Gifts & Crafts Co. v. United States</u>, 716 F.3d 1370, 1374 (Fed. Cir. 2013).

[3] Here, Commerce's instructions, rather than the ministerial implementation of those instructions, are at issue as jurisdiction is asserted under 28 U.S.C. § 1581(i).  A parallel case has been filed under § 1581(a) that addressed the protests filed by Michaels related to the appropriateness of Custom's actions in implementing the instructions.  <u>Michaels Stores, Inc. v. United States</u>, Ct. No. 12-145 (CIT filed May 23, 2012).  For purposes of this action, Michaels claims that Commerce's instructions were clear on their face, provided no discretion to Customs, and were contrary to law.

only when those companies directly exported the merchandise to the United States.  See id.

        During both PORs, Michaels made cash deposits for the entries of cased pencils with Customs pursuant to Michaels' interpretation of the AD order.  Pl.'s Mem. at 2, 6.  The corresponding cash deposit instructions indicated that the cash deposit rate for exporters not specifically listed and without a separate rate, however, was "the PRC-wide rate of 114.90 percent."[4]  Id.  Michaels instead made cash deposits at the cash deposit rates assigned to the corresponding producer of the pencils.  Pl.'s Mem. at 2, 6; Def.'s Resp. at 6, 12.  While Commerce initiated administrative reviews of some of the producers at issue here, certain producers withdrew their requests for administrative review, and Commerce reviewed only one of the producers at issue here, Rongxin, and only for the 2008–2009 POR.  Final Results 2011, 76 Fed. Reg. at 27,989.  None of the subject exporters were specifically identified by Commerce, and none of the subject exporters requested a review.  See Certain Cased Pencils From the People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 76 Fed. Reg. 2337, 2339 (Dep't Commerce Jan. 13, 2011) ("Partial Rescission of AD Review"); Certain Cased Pencils From the People's Republic of China: Rescission of Antidumping Duty Administrative Review, 76 Fed. Reg. 27,990, 27,990 (Dep't Commerce May 13, 2011) ("Rescission of AD Review").  For both PORs, Commerce issued

---

[4] Although the PRC-wide entity was not specifically examined for this particular POR, the PRC-wide rate applied here was "the rate established in the administrative review for the most recent period."  Certain Cased Pencils From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review, 76 Fed. Reg. 27,988, 27,989 (Dep't Commerce May 13, 2011) ("Final Results 2011").  Commerce most recently conducted a reexamination of the PRC-wide entity for the 2007–2008 POR and confirmed the PRC-wide rate to be 114.90 percent.  See Certain Cased Pencils From the People's Republic of China: Final Results of the Antidumping Duty Administrative Review, 75 Fed. Reg. 38,980, 38,981 (Dep't Commerce July 7, 2010) ("Final Results 2010").

liquidation instructions, ordering Customs to liquidate the subject entries at the cash deposit rate in effect at the time of entry. Pl.'s Mem. at 2–4, 7–8; Def.'s Resp. at 8, 10, 14–15.

Furthermore, following the 2008–2009 administrative review of Rongxin, Commerce issued a producer's rate for Rongxin of 0.17 percent. Pl.'s Mem. at 4; Def.'s Resp. at 9. Commerce also issued "exporter/importer-specific"[5] liquidation instructions for Rongxin without including Michaels on the importer list.[6] Def.'s Resp. at 9–10. Consequently, for pencils manufactured by Rongxin during the 2008–2009 POR that were purchased by Michaels through a different export company, Customs also liquidated these entries at a rate equal to the

---

[5] Commerce repeatedly referred to "exporter/importer-specific" rates, but that term is not defined in the statute or regulations. Instead, Commerce apparently uses this term to refer to the rate calculated for the subject merchandise when it enters the United States pursuant to § 351.212 of its regulations. See 19 C.F.R. § 351.212(b)(1); see also Final Results 2011, 76 Fed. Reg. at 27,989 (referencing § 351.212(b)(1) as the source of the "exporter/importer-specific" or "customer-specific" rate). The regulation, to which Commerce referred, provides:

> If the Secretary has conducted a review of an antidumping order under § 351.213 (administrative review), § 351.214 (new shipper review), or § 351.215 (expedited antidumping review), the Secretary normally will calculate an assessment rate for each importer of subject merchandise covered by the review. The Secretary normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes. The Secretary then will instruct the Customs Service to assess antidumping duties by applying the assessment rate to the entered value of the merchandise.

19 C.F.R. § 351.212(b)(1). Of course, an assessment rate is not a less than fair value rate, i.e. the dumping rate, but a rate based on the value of the entered merchandise, as noted in the regulation. Id.

[6] [[　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　]] See Def.'s Confidential App. in Supp. of its Resp. to Pl.'s Mot. for Summ. J. at A30–32 ("Def.'s Confidential App.").

Court No. 12-00146                                                                                                Page 6

PRC-wide rate of 114.90 percent.  Def.'s Resp. at 11.

Following liquidation, Michaels was assessed supplemental duties associated with these entries, seeking the difference between the cash deposits Michaels made at the producer's rate and liquidation at the PRC-wide rate.  Pl.'s Mem. at 6, 9.  After most of Michaels' protests with Customs were unsuccessful, Michaels filed the present action.  Although defendant attempted to dismiss the majority of Michaels' claims for lack of jurisdiction, the court denied that motion on December 27, 2012.  See Michaels Stores, 2012 Ct. Int'l Trade LEXIS 161, at *4.

## JURISDICTION AND STANDARD OF REVIEW

As established in its previous opinion, the court has jurisdiction pursuant to 28 U.S.C. § 1581(i) (2006).[7]  The court will find unlawful an action by Commerce if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see 28 U.S.C. § 2640(e) (directing the court to evaluate 28 U.S.C. § 1581(i) cases under the standards set forth in the Administrative Procedure Act).  Moreover, the court will find

---

[7] The court's jurisdiction is proper despite defendant's claim that Michaels did not properly exhaust administrative remedies by participating in the administrative review.  Defendant misrepresents the scope and purpose of an administrative review, which does not provide a remedy for improperly issued liquidation instructions.  Def.'s Resp. 32–34.  Rather, an administrative review simply allows a company to challenge its rate.  See Consol. Bearings Co. v. United States, 348 F.3d 997, 1003–04 (Fed. Cir. 2003) (refusing to hold that a company, which did not request an administrative review, failed to satisfy the exhaustion doctrine when challenging liquidation instructions, recognizing that an administrative review cannot serve as a challenge to the validity of liquidation instructions because an administrative review can only challenge the rate calculated and not instructions issued by Commerce).  In this case, Michaels does not challenge the PRC-wide rate, its producers' rates, or request its own or an exporter's separate rate.  Rather it challenges how Commerce interprets a regulation dictating final liquidation.  In fact, the court already made clear in this case that there are no jurisdictional concerns related to exhaustion of remedies.  See Michaels Stores, 2012 Ct. Int'l Trade LEXIS 161, at *4.  Further, the regulation at issue is not completely clear, and Michaels is not charged with knowing how Commerce finally would interpret it, to the extent this is a discretionary issue.

that Commerce has abused its discretion if its "decision (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law . . . or (4) follows from a record that contains no evidence on which [Commerce] could rationally base its decision." See Sterling Fed. Sys. v. Goldin, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting Gerritsen v. Shirai, 979 F.2d 1524, 1529 (Fed. Cir. 1992)).

## DISCUSSION

I.   **Michaels' Motion for Summary Judgment**

After apparently conceding that the administrative record[8] would not be sufficient to adjudicate this case, defendant incorrectly argues that Michaels' motion for summary judgment is improper. See Def.'s Resp. at 20. Under 28 U.S.C. § 1581(i)(4), the court has jurisdiction over civil actions pertaining to the "administration and enforcement" of certain actions taken by Commerce. Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). Therefore, when the plaintiff's "case hinges on pure questions of law, resolution by summary judgment is appropriate." Can. Wheat Bd. v. United States, 32 CIT 1116, 1121, 580 F. Supp. 2d 1350, 1356 (2008) (finding summary judgment appropriate in a § 1581(i) case).

A motion for summary judgment, as opposed to judgment on the agency record, is

---

[8] Defendant contends that Michaels was required to move for judgment on the agency record rather than summary judgment, thereby limiting the court's review to the agency record related to the liquidation instructions, preventing Michaels from referencing the cash deposit instructions. See Def.'s Resp. at 20. Defendant admits, however, that Michaels could have moved to supplement the agency record and that the liquidation instructions incorporate, by reference, the cash deposit instructions. Id. Thus, the cash deposit instructions were in substance part of the record. Michaels' motion for summary judgment merely included in concrete form what should have been in the record, with the same result. Further amelioration in this regard is unnecessary.

appropriate in this case because Michaels' arguments do not challenge the final results of an administrative review. Michaels merely challenges the liquidation instructions and, only by reference, the cash deposit instructions. The liquidation instructions are not part of an administrative review but rather implement the results of a review. Pl.'s Mem. at 17, 19, 22; see Consol. Bearings Co. v. United States, 348 F.3d 997, 1002 (Fed. Cir. 2003) (distinguishing between a challenge to the final results of administrative review and a challenge to liquidation instructions). Consequently, just as in Canadian Wheat Board where the plaintiffs properly challenged a notice of revocation with a motion for summary judgment, here the "true nature" of Michaels' argument is a challenge to the administration and enforcement of Commerce's final determination and not to the determination itself. See 32 CIT at 1127, 580 F. Supp. 2d at 1356. Thus, Michaels' motion for summary judgment is properly before the court.[9]

## II. Appropriateness of Michaels' Cash Deposit Instructions Claims

Defendant contends that Michaels is barred from disputing the lawfulness of the cash deposit instructions because: (1) Michaels did not explicitly raise the issue in its complaint, (2) Michaels' challenges to the cash deposit instruction are time barred, and (3) the court lacks subject matter jurisdiction because Michaels failed to exhaust all remedies.[10] Def.'s Resp. at

---

[9] Additionally, the court will interpret the United States' prayer for relief seeking judgment in its favor as a cross motion for summary judgment. Def.'s Resp. at 34 ("[Defendant] respectfully request[s] that the Court deny plaintiff's motion and enter judgment in favor of the United States."); see Shell Oil Co. v. United States, 781 F. Supp. 2d 1313, 1322 (CIT 2011) ("[S]ummary judgment may be granted sua sponte in favor of the non-moving party, or even in the absence of any motion, provided that all parties are afforded an appropriate opportunity to come forward with relevant evidence." (citing Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986)), aff'd, 688 F.3d 1376 (Fed. Cir. 2012).

[10] The issue of exhaustion is dealt with above. To reiterate, requesting an administrative
(continued...)

Court No. 12-00146                                                                                                    Page 9

29–34. Moreover, defendant contends that even if Michaels can challenge indirectly the cash deposit instructions, those instructions are lawful. Def.'s Resp. at 24–29. Here, the court addresses whether Michaels properly asserted a challenge to the cash deposit instructions as part of the liquidation instructions.

The court simply requires that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . which may include . . . different types of relief." USCIT R. 8(a)(2)–(3); see also USCIT R. 8(f) ("Pleadings must be construed so as to do justice"). Pleadings are sufficient if they adequately notify the defendant of "what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Separately, a cause of action under 28 U.S.C. § 1581(i) "is barred unless commenced . . . within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

Defendant fails to demonstrate that all claims referencing the cash deposit instructions should be disregarded. Even though the initial complaint did not mention explicitly the cash deposit instructions, defendant was put on notice that Michaels intended to challenge the validity of those cash deposit instructions because Michaels expressly challenged the liquidation rate that was set by reference to the cash deposit instructions. Compl. ¶¶ 1, 29–31, 43–44, 47, 50; Pl.'s Mem. Ex. 6 at 69, Ex. 9 at 84, Ex. 11 at 91. Defendant acknowledges that Michaels' complaint alleges that the liquidation instructions were improper. Def.'s Resp. at 30. Michaels has consistently advanced one argument, that the liquidation instructions were improper, and it

---

[10](...continued)
review would not remedy improper liquidation instructions, even though they reference deposit instructions; therefore, it is not a remedy that must be exhausted.

Court No. 12-00146                                                                                                   Page 10

simply clarified in its motion for summary judgment that Commerce's allegedly unlawful conduct likely stems back to the cash deposit instructions, as plaintiff now understands how Commerce construes the deposit rate instructions. Therefore, the complaint sufficiently put defendant on notice because it alleged that the cash deposit instructions that were incorporated into the liquidation instructions, were incorrect. Pl.'s Reply Br. to Def.'s Resp. to Pl.'s Mot. for Summ. J. ("Pl.'s Reply") at 6; see Twombly, 550 U.S. at 555 (describing the requirement of fair notice in the context of the analogous Federal Rule of Civil Procedure). As a result, defendant cannot claim that it was surprised by Michaels' claims and arguments raised here.

Moreover, this claim is not time-barred because the cause of action accrued once the liquidation instructions were issued and final duties were assessed on Michaels' entries.[11] Michaels can challenge the lawfulness of the liquidation instructions that give final effect to the cash deposit instructions, as interpreted by Commerce.[12] See Pl.'s Mem. at 11–12; Def.'s Resp. at 8, 13, 15. Until the liquidation instructions were issued for plaintiff's specific merchandise and it was liquidated, Commerce's final interpretation of the deposit instructions and their meaning as to plaintiff's merchandise were not definitive.

---

[11] The liquidation instructions under which Michaels' entries were liquidated were issued on July 15, 2011, with respect to the 2008–2009 POR, and June 1, 2011, with respect to the 2009–2010 POR. Def.'s Public App. in Supp. of Its Resp. to Pl.'s Mot. for Summ. J. at A6–7, A16–17. The summons and complaint in this case were filed on May 23, 2012, Dkt. Entry Nos. 1, 5, well within the applicable statute of limitations. See 28 U.S.C. § 2636(i) (providing for a two year statute of limitations).

[12] The United States operates a retrospective system of antidumping duties, where the final dumping margin is not calculated until after the subject merchandise has already been imported. See 19 C.F.R. § 351.212(a); SSAB N. Am. Div. v. United States, 32 CIT 795, 797–98, 571 F. Supp. 2d 1347, 1350–51 (2008) (describing the retrospective system and the importance of both cash deposits and suspension of liquidation).

### III. Content of Commerce's Cash Deposit and Liquidation Instructions

Michaels argues that Commerce should have used the producer's rate to determine the cash deposit rate, and ultimately the liquidation rate, applicable to the entries of the subject merchandise, instead of utilizing the PRC-wide rate, which Michaels characterizes as an "all others" rate. See Pl.'s Mem. at 15–17. Defendant argues, in effect, that the PRC-wide rate serves as a noncombination rate assigned to all PRC exporters who have not obtained a separate rate, given the presumption of state control in NMEs,[13] and therefore is applicable here. Def.'s Resp. at 24–26. Accordingly, the only dispute here is whether the PRC-wide rate for the PRC-entity serves as a specific, i.e. noncombination, rate applicable to the subject exporters.[14] Because Commerce has an established policy of treating non-separate NME companies as a single entity, unless they prove that they are not under state control,[15] Commerce issued lawful instructions when it treated the subject exporters as part of the PRC-entity. Stated otherwise,

---

[13] Although the continued presumption of state control within an NME like the PRC has been questioned in other cases, the PRC remains classified by Commerce as an NME. See 19 U.S.C. § 1677(18) (defining an NME). Compare GPX Int'l Tire Corp. v. United States, 893 F. Supp. 2d 1296, 1304 (CIT 2013) (discussing countervailing duties, in a recent case, and noting that "Commerce based its change in policy on the evolution of China's economy from a centrally-controlled monolithic economy towards a market economy"), with Sigma Corp. v. United States, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997) (noting Commerce's practice, in an earlier case, that "because the PRC is a nonmarket economy, all commercial entities in the country are presumed to export under the control of the state." (emphasis added)). The court does not discuss the continued validity of this presumption because Michaels has not challenged the classification of the PRC as an NME or otherwise challenged the presumption.

[14] Although this is the central dispute between the parties, the issue is not clearly argued in the briefs.

[15] Michaels has not challenged the validity or reasonableness of Commerce's separate rate methodology, and therefore, the court does not address that question here. Michaels instead claims that Commerce failed to follow its own regulations.

because the subject exporters did not seek separate rates, they are reviewed as part of the collective PRC-entity and assigned the PRC-wide rate, not a separate rate or a separate combination exporter/producer rate, as will be explained further.

      Commerce's actions in determining the appropriate cash deposit rate for nonproducing exporters where an AD order is in place are governed by 19 C.F.R. § 351.107 (2013). It provides, in relevant part:

> [I]f the Secretary has not established previously a combination cash deposit rate . . . for the exporter and producer in question or a noncombination rate for the exporter in question, the Secretary will apply the cash deposit rate established for the producer. If the Secretary has not previously established a cash deposit rate for the producer, the Secretary will apply the "all-others" rate . . . ."

<u>Cash Deposit Rates for Nonproducing Exporters; Rates in Antidumping Proceedings Involving a Nonmarket Economy Country</u>, 19 C.F.R. § 351.107(b)(2). Combination and noncombination rates in market economies ("ME") are company-specific rates,[16] and the all others rate typically is the weighted average of the rates for the companies investigated, with certain exclusions. 19 U.S.C. § 1673d(c)(1)(B)(i), (c)(5). The regulations clarify, however, that for non-market economies, "'rates' may consist of a single dumping margin applicable to all exporters and producers." 19 C.F.R. § 351.107(d). Moreover, whenever the statute is silent on a particular issue, it is well-settled that Commerce may "formulate policy and make rules 'to fill any gap left, implicitly or explicitly, by Congress.'" <u>SKF USA Inc. v. United States</u>, 254 F.3d 1022, 1030 (Fed. Cir. 2001) (quoting <u>Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.</u>, 467 U.S. 837,

---

[16] Although 19 U.S.C. § 1673d does not define noncombination rates, a plain reading of 19 C.F.R. § 351.107(b)(2) makes clear that a noncombination rate and an all others rate are distinct concepts because they are listed as different options for Commerce to utilize in assigning the appropriate rate.

Court No. 12-00146 Page 13

843 (1984)).

The regulations above define Commerce's practice of determining the appropriate cash deposit rates in the ME context, by providing a sequence of options. NMEs are treated differently because Commerce applies a presumption of state control in NME countries over both producers and exporters. Separate Rates and Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries, 70 Fed. Reg. 17,233, 17,233 (Dep't Commerce Apr. 5, 2005). Pointing to this presumption of state control, Commerce rejected the idea that it should assign cash deposit rates to entries based on the identity of the producer of the merchandise as opposed to the identity of the nonproducing exporter. See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,303, 27,305 (Dep't Commerce May 19, 1997) ("Preamble") (explaining that the new regulation does not alter Commerce's practice in NME cases). Both parties agree that at issue in this case are nonproducing exporters in the NME context, which requires the application of 19 C.F.R. § 351.107(b)(2) in conjunction with (d) to determine the cash deposit rate. Pl.'s Mem. at 2, 6; Def.'s Resp. at 6, 12.

For non-producing exporters, like trading companies, Commerce has said that it "intend[s] to continue calculating AD rates for NME export trading companies, and not the manufacturers supplying the trading companies." Preamble, 62 Fed. Reg. at 27,305 (providing Commerce's first clarification of § 351.107). As a result, under Commerce's present methodology, exporters are required to prove that they are not part of the NME-wide entity to be eligible for a separate rate, which occurs through a formal investigation process. See Transcom, Inc. v. United States, 294 F.3d 1371, 1381 (Fed. Cir. 2002) ("Commerce made clear the consequences to an exporter of not rebutting the presumption of state control and establishing its

independence: the exporter would be assigned the single rate given to the NME entity").[17] Only upon achieving separate rate status can an exporter be eligible for the NME equivalent of the all others rate for separate rate companies. See Yangzhou Bestpak, 716 F.3d at 1374 ("The separate rate for eligible non-mandatory respondents is generally calculated following the statutory method for determining the 'all others rate.'"). Failure to qualify for a separate rate means that Commerce will analyze the exporter through the lens of the presumption of state control. See id. at 1373 (citing Sigma Corp., 117 F.3d at 1405).

    During the POR, liquidation is suspended for all entries of covered goods until Commerce concludes its review, if any. Then, liquidation instructions are issued by Commerce to Customs to liquidate at either the review rate or at the appropriate cash deposit rate if the company is not reviewed. 19 C.F.R. § 351.212(b),(c)(1)(i). Here, all of the merchandise from the subject exporters was liquidated pursuant to these instructions at the PRC-wide rate. Pl.'s Mem. at 6, 9.

    In the present matter, although all of the producers of cased pencils imported by Michaels during the PORs in question were individually investigated and assigned their own rates, those rates are irrelevant to the exporters' rates because the regulation calls for the rates of

---

[17] This presumption of state control and the separate rate analysis is explained in more detail by Commerce's various policies and orders. See Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries at 4 (Apr. 5, 2005), available at http://ia.ita.doc.gov/policy/bull05-1.pdf (last visited Aug. 19, 2013) ("Policy Bulletin 05.1") (requiring a company to prove to Commerce a lack of de facto and de jure control to achieve separate rate status); see, e.g., Brake Rotors From the People's Republic of China: Rescission of Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty Administrative Review, 64 Fed. Reg. 61,581, 61,583 (Dep't Commerce Nov. 12, 1999) (engaging in an analysis of de facto and de jure control related to Commerce's rebuttable presumption of state control).

Court No. 12-00146												Page 15

the exporters to be used, if such exist, prior to looking at the producers' rates.  19 C.F.R. § 351.107(b)(2).  Here, the PRC-wide rate serves as a noncombination rate for these nonproducing exporters because § 351.107(d) of the regulation sheds light on the meaning of § 351.107(b)(2).  The regulation indicates that for an AD proceeding involving an NME, such as the PRC in the present case, the term "rate" can be read to include the possibility of a single rate for exporters, producers, or both.  See 19 C.F.R. § 351.107(d).  This "single rate" here is the PRC-wide rate.

      Although Commerce allows exporters to apply for separate rates, no evidence exists, in this instance, that the exporters used by Michaels did so.  Therefore, the subject exporters were not eligible for separate rates and were presumed by Commerce to be under state control.  See Transcom, 294 F.3d at 1381–82 (affirming the CIT's decision to sustain Commerce's separate rate NME procedure); cf. Certain Oil Country Tubular Goods From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping, 75 Fed. Reg. 20,335, 20,338, 20,340 (Dep't Commerce Apr. 19, 2010) (utilizing the PRC-wide rate for exporters not individually examined for separate rate status, but providing separate rates to exporters who applied for and established independence and were individually examined).  Rather, this failure to apply for separate rate status resulted in the use of the single PRC-wide rate for the exporters in question under Commerce's methodology.[18]

---

[18] Michaels attempts to differentiate the cased pencils that were produced by Rongxin. Pl.'s Mem. 13–14.  Commerce acted lawfully and reasonably here as well by liquidating the entries manufactured by Rongxin, but exported by non-separate rate companies, at the PRC-wide rate.  Michaels admits that Rongxin was not the exporter of the goods but simply the

(continued...)

    Both sides also raise the additional issue of the change in Commerce's NME policy,[19] but the policy is of no consequence because it impacts only situations in which there is an exporter that is given a separate rate.[20] Pl.'s Mem. at 23–24; Def.'s Resp. at 28–29; see <u>Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties</u>, 76 Fed. Reg. 65,694, 65,694–95 (Dep't Commerce Oct. 24, 2011) ("<u>Assessment of AD Duties, Notice of Policy</u>").[21] Here, the court has already concluded that the subject exporters did not apply for a

---

  [18](...continued)
manufacturer. <u>Id.</u> at 20. Again, this exporter was not eligible for a separate rate because it had not applied through Commerce's separate rate procedure. Instead, Commerce applied the PRC-wide rate for the exporter because it was presumed to be a part of the PRC-wide entity. <u>Accord</u> <u>Royal United Corp. v. United States</u>, 714 F. Supp. 2d 1307, 1311 n.6 (CIT 2010) (collecting cases upholding Commerce's practice of notifying unnamed exporters from the relevant NME that they will be subject to the results of the review as part of the NME entity unless they establish their separate rate status).

  [19] This issue is raised only in reference to the liquidation rate of cased pencils produced by Rongxin during the 2008–2009 POR. <u>See</u> Pl.'s Mem. at 23.

  [20] Although Michaels argues that this policy is more than a refinement and constitutes a significant change, based on the Federal Circuit's comments on an analogous change in the ME context in <u>Parkdale Int'l v. United States</u>, 475 F.3d 1375, 1379 (Fed. Cir. 2007), <u>Parkdale</u> does not affect the analysis in this case because the court has determined that the policy does not apply to the subject exporters. Accordingly, the court will not decide whether the NME policy refinement constitutes a "significant change," but the court notes that this situation is different from the change in policy for MEs, given the presumption of state control in the NME context.

  [21] Commerce's policy "refinement" states:

> [F]or merchandise entered at the <u>separate rate</u> applicable to a reviewed exporter, but which . . . . are not reported in the reviewed company's U.S. sales databases submitted to the Department during an administrative review, or otherwise determined not covered by the review (i.e., the reviewed exporter claims no shipments), the Department will instruct [Customs] to liquidate such entries at the NME-wide rate as opposed to the company-specific rate declared by the importer at the time of entry.

(continued...)

Court No. 12-00146                                                                                          Page 17

separate rate through Commerce's separate rate procedure.  Additionally, the policy may be of little consequence given a 2005 policy by Commerce that clarifies that an exporter's entries are not eligible for separate cash deposit rates if the corresponding merchandise is not reported by the producer during the investigation or review.  See Policy Bulletin 05.1 at 6–7.

        Moreover, defendant's position here is not a post-hoc rationalization, as Michaels puts it, but instead it logically flows from Commerce's previous statements and policies regarding exporters in NMEs.  See Pl.'s Reply at 16.  Specifically, Commerce legitimately attempts to prevent NME companies from avoiding Commerce's AD orders.  The language in § 351.107(d), when read in conjunction with § 351.107(b)(2), upholds two key policy rationales in the NME context: that an exporter's rate is preferable to a producer's rate as the exporter is likely the party to set prices and know which goods are destined for the United States, and that each exporter has the burden of proving it is eligible for a separate rate.  See Since Hardware (Guangzhou) Co. v. United States, Slip Op. 10-108, 2010 Ct. Int'l Trade LEXIS 119, at *3–4 (Sep. 27, 2010) (quoting Sigma Corp., 117 F.3d at 1405–06 (explaining that exporters have more information related to issues of state control)); Preamble, 62 Fed. Reg. at 27,303–05.  Therefore, even though the producers had separate rates, Commerce's concern remains that these producers will use a state-controlled exporter, allowing the state to dump the goods through that exporter while benefitting from the producer's lower rate.[22]

---

    [21](...continued)
Assessment of AD Duties, Notice of Policy, 76 Fed. Reg. at 65,694 (emphasis added).

    [22] This concern is especially evident when the producer does not know or report the ultimate destination of its goods that are eventually purchased by a PRC-based exporter and sent

(continued...)

It is not that the producer's rate will never be used by Commerce in the NME context; the producer, however, may need to export the goods itself or use a separate rate exporter to avoid the PRC-wide rate. Under Michaels' theory, Commerce would be required to list every PRC-controlled exporter, known or unknown, in its investigation and indicate that each exporter's entries will be assessed at a specific rate, the PRC-wide rate. Not only is this burden on Commerce possibly impracticable, but this also could allow PRC firms to establish new, unlisted exporters that have not applied for a separate rate to export their goods during a new POR, avoiding the PRC-wide rate, and possibly avoiding review. See Royal United, 714 F. Supp. 2d at 1310 (noting Commerce's practice that every exporter from an NME country that is not particularly referenced in the review is in fact "covered by the results of the review" and is assessed the NME-wide rate).[23] Instead, Commerce presumes the PRC to be one entity with one PRC-wide rate to prevent such conduct.

Thus, Commerce lawfully applied the PRC-wide rate to the subject exporters because the PRC-wide rate constitutes a noncombination rate for exporters that are part of the PRC-wide entity under Commerce's methodology. Consequently, pursuant to 19 C.F.R.

---

[22](...continued)
into the United States[[                                    ]]. Def.'s Confidential App. at A27–28. In those situations, the sales are not reviewed when calculating a rate for the producer, a situation which could allow dumping to continue unnoticed.

[23] A new shipper is defined as "an exporter or producer that did not export, and is not affiliated with an exporter or producer that did export, to the United States during the period of investigation." 19 C.F.R. § 351.214(a). Therefore, under Commerce's methodology in the NME context, a new shipper would have to apply for separate rate status to show a lack of affiliation with the government entity that did export during the period of investigation.

*Confidential Information Deleted*

Court No. 12-00146                                                                                               Page 19

§ 351.107(b)(2), Commerce lawfully issued instructions ordering liquidation of these entries at the PRC-wide rate and not the producer's rate.

## CONCLUSION

For the foregoing reasons, the court denies Michaels' motion for summary judgment. Although the United States did not move separately for summary judgment and instead requested judgment only at the conclusion of its brief, the court's holding compels the conclusion that the court should enter summary judgment in favor of the United States. Judgment will be entered accordingly.

                                                                                /s/ Jane A. Restani
                                                                                  Jane A. Restani
                                                                                          Judge

Dated: August 21, 2013
       New York, New York